## WOODS v. BOYLE et al.
### Civ. No. 1092.

District Court, W. D. Michigan, S. D.
May 7, 1948.

Paul Marshall and Allan M. Thompson, both of Cleveland, Ohio, for plaintiff.

Paul O. Strawhecker, of Grand Rapids, Mich., for defendants.

STARR, District Judge.

Defendants Russell J. Boyle and Ann Boyle are husband and wife. In May, 1945, Mrs. Boyle purchased the single-residence property at 216 College avenue, S. E., Grand Rapids, Michigan, and remodeled it into a lower and an upper apartment. She and her husband occupied the lower apartment. On September 24, 1945, she rented the upper apartment by written lease to Adelbert G. Green and wife at a rental of $150 a month. Mr. Boyle participated with his wife in the negotiation of this lease.

The Greens took possession of the apartment about October 15, 1945, and on December 13th of that year the area rent control office issued its order reducing the maximum rent from $150 to $100 a month. This reduction was to be effective on the next rent date, which was December 15th. Tenant Adelbert Green had paid $150 rent for the one-month period from December 15, 1945, to January 15, 1946, prior to receiving a copy of the order reducing the rent, but it appears that the $50 excess in this payment was refunded to him. The Greens remained in the apartment until about November 1, 1947. During the period from January 15, 1946, to November 1, 1947, tenant Green paid to Mrs. Boyle by check the maximum rent of $100 a month

and also paid to Mr. Boyle the sum of $50 a month in cash. It was discussed and mutually agreed by Green and Boyle that this additional $50 a month should be paid to Boyle in cash.

On October 3, 1947, the Housing Expediter filed complaint against defendants. in pursuance of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 901 et seq., and the Housing and Rent Act of 1947, 50 U.S.C.A.Appendix, § 1881 et seq. Plaintiff alleged that defendants had violated the rent-control law and regulations thereunder by demanding, accepting or receiving rent for the upper apartment at 216 College avenue, in excess of the established maximum rental. Plaintiff asked for a judgment for treble damages or, in the alternative, for a judgment for double damages and for restitution of the excess rent to the tenants. Defendants answered, denying the alleged violation and plaintiff's right to judgment. The case was tried by the court without a jury. At the conclusion of the trial plaintiff dismissed the case as to Mrs. Boyle.

■ Plaintiff also asked for an injunction restraining defendants from further violation of the rent-control law and regulations, but as tenants Green had vacated the apartment and it appeared that defendants were complying with the maximum rent order at the time of trial, no injunctive relief will be granted.

The principal question presented is whether or not the additional cash payments of $50 a month by tenant Green to Mr. Boyle were paid and received in violation of the rent-control law and regulations thereunder. Under Section 205(c) of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 925(c), this court has jurisdiction of the parties and of the subject matter of this suit. The pertinent provisions of the rent-control law and regulations thereunder are as follows: Section 4(a) of the Act, 50 U.S.C.A.Appendix, § 904(a), provides in part: "It shall be unlawful, regardless of any contract, agreement, lease, or other obligation heretofore or hereafter entered into, for any person * * * to demand or receive any rent for any defense-area housing accommodations, or otherwise to do or omit to do any act, in violation of any regulation or order under section 2, or of any price schedule effective in accordance with the provisions of section 206, or of any regulation, order, or requirement under section 202(b) or section 205 (f), or to offer, solicit, attempt, or agree to do any of the foregoing." .

Section 205(a) [1] of the Act, 50 U.S.C.A. Appendix, § 925(a), provides:

"Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond."

Section 1(b) of the Emergency Price Control Act, as amended in 1946, 50 U.S.C. A.Appendix, § 901(b), provides: "The provisions of this Act, and all regulations, orders, price schedules, and requirements thereunder, shall terminate on June 30, 1947, * * * except that as to offenses committed, or rights or liabilities incurred, prior to such termination date, the provisions of this Act and such regulations, orders, price schedules, and requirements shall be treated as still remaining in force for the purpose of sustaining any proper suit, action, or prosecution with respect to any such right, liability, or offense."

Section 205(e) of the Emergency Price Control Act, as amended in 1947, 50 U.S.C. A.Appendix, § 925(e), provides in part: "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may, within one

---

[1] This section is substantially the same as Section 206(b) of the Housing and Rent . Act of 1947, 50 U.S.C.A. Appendix, § 1896(b).

year from the date of the occurrence of the violation, except as hereinafter provided, bring an action against the seller on account of the overcharge. In any action under this subsection, the seller shall be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of the following sums is greater: (1) Such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine, or (2) an amount not less than $25 nor more than $50, as the court in its discretion may determine: Provided, however, That such amount shall be the amount of the overcharge or overcharges if the defendant proves that the violation of the regulation, order, or price schedule in question was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation. For the purposes of this section the payment or receipt of rent for defense-area housing accommodations shall be deemed the buying or selling of a commodity, as the case may be; and the word 'overcharge' shall mean the amount by which the consideration exceeds the applicable maximum price. If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer either fails to institute an action under this subsection within thirty days from the date of the occurrence of the violation or is not entitled for any reason to bring the action, the Administrator may institute such action on behalf of the United States within such one-year period. If such action is instituted by the Administrator, the buyer shall thereafter be barred from bringing an action for the same violation or violations. Any action under this subsection by either the buyer or the Administrator, as the case may be, may be brought in any court of competent jurisdiction. A judgment in an action for damages under this subsection shall be a bar to the recovery under this subsection of any damages in any other action against the same seller on account of sales made to the same purchaser prior to the institution of the action in which such judgment was rendered."

Section 302(g) of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 942(g), provides: "The term 'rent' means the consideration demanded or received in connection with the use or occupancy or the transfer of a lease of any housing accommodations." Section 202(e) of the Housing and Rent Act of 1947, 50 U.S.C.A. Appendix, § 1892(e) contains identical wording.

Section 13(a) (10) of the rent regulations for housing issued under the 1942 Act, as amended, provides: "'Rent' means the consideration, including any bonus, benefit, or gratuity, demanded or received for or in connection with the use or occupancy of housing accommodations or the transfer of a lease of such accommodations." Section 1 of the rent regulations issued under the Housing and Rent Act of 1947 is identical in wording.

Section 9(a) of the rent regulations for housing under the 1942 Act, as amended, and section 8(a) of the regulations under the Housing and Rent Act of 1947 both provide as follows: "The maximum rents and other requirements provided in this regulation shall not be evaded, either directly or indirectly, in connection with the renting or leasing or the transfer of a lease of housing accommodations, by way of absolute or conditional sale, sale with purchase money or other form of mortgage, or sale with option to repurchase or by modification of the practices relating to payment of commissions or other charges or by modification of the services furnished with housing accommodations, or by tying agreement, or otherwise."

The evidence establishes that during the period from January 15, 1946, to November 1, 1947, tenant Green paid Mrs. Boyle the maximum rental of $100 a month by check, and during 21 months of this period he paid Mr. Boyle $50 a month in cash, or a total of $1,050. Plaintiff contends in effect that under the above-quoted provisions of the rent-control law and regulations thereunder, the cash payments of $50 a month to Mr. Boyle were a "bonus, benefit, or gratuity, demanded or received for or in connection with the use or occupancy" of the apartment, and were an evasion and viola-

tion of said law and regulations. Defendant Boyle contends that these monthly payments were to apply upon a certain item of indebtedness which he claims Green owed him.

It appears that Green and Boyle, both residents of Grand Rapids, Michigan, had been close friends for many years and had engaged in business transactions together. Green is the general agent of a life-insurance company and Boyle is now the publisher of a business magazine. Having met with financial reverses, Boyle was employed by Green in the summer of 1932 as an insurance salesman with a drawing account of $100 a week chargeable against his commissions. When this employment arrangement was terminated in 1933, Boyle's drawing account had exceeded his commissions by about $1,250, and he gave Green his promissory demand note for that amount. Green retained this note until about 1939, at which time he delivered it back to Boyle in partial payment for Boyle's services in connection with the purchase of the shares of stock of a furniture company. Boyle accepted the return of the note in partial payment for his services rendered Green, and then destroyed it. Boyle testified in substance that at the time he accepted and destroyed this note, he informed Green that he did not owe it and that he would expect it "to be taken into consideration on other deals" which they might have. This promissory-note transaction forms the basis for Boyle's present claim that Green owed him $1,250 and that Green's cash payments of $50 a month were to apply on that debt.

It should be noted that the testimony of Green and Boyle is not in harmony, in that Green says he paid the additional $50 a month as rent for the apartment and Boyle says the payments were to apply on the above-mentioned indebtedness of $1,250. To determine the facts and reasonable inferences to be drawn therefrom, it is necessary to review the testimony of both Green and Boyle in some detail. At the hearing on plaintiff's motion for a preliminary injunction Green testified in part:

"I negotiated with Mr. Boyle, but when I moved in I was told I was dealing with Mrs. Boyle. * * *

"I signed a lease for $150 a month, with Mr. Boyle. * * *

"Q. Did you discuss the fact with Mr. Boyle that your lease called for $150 a month, and that the rent had been reduced by the order of the area rent office to $100 a month?

"A. I believe I did. * * *

"The facts are I had arranged to pay $150 a month for the apartment, and I paid it; I thought it was worth it.

"Q. Even after the order (reducing the rent)?

"A. I thought so. * * *

"My office sent Mrs. Boyle $100 a month, and I paid him (Mr. Boyle) $50 occasionally. * * *

"I had arranged to pay $150; it was all right with me, I was not dissatisfied. * * *

"Q. * * * Did you decide that, or did Mr. Boyle decide it, or did you decide it together?

"A. We decided it together. * * *

"Mr. Boyle and I talked it over. * * *

"Q. During the period that you occupied this apartment, after you received this notice from the area rent control office, that the rent was fixed at $100 a month, you paid $150 a month?

"A. Right. * * *

"The Court: The question is: 'Why did you pay her $100 and why did you pay him $50?' * * *

"A. I wanted to see that he got $150 a month for the apartment. * * *

"My office sent her $100, I paid him $50 myself. * * *

"Q. In other words, you wanted him to have $150, despite the order of the area rent director, is that it?

"A. Yes, that is right.

"Q. You felt that was a safe way to do that? * * *

"A. That is right."

On examination during the trial Green testified:

"Q. * * * Did you receive a copy of the area rent order * * * reducing the rent from $150 a month for these premises to $100 a month?

"A. Yes, sir. * * *

"Q. And did you pay $50 a month for the use of those premises in addition to that $100 per month? * * *

"A. I paid him $50 a month. * * *

"Q. What did you pay him $50 per month for?

"A. I paid $50 a month, because I had signed a lease for $150 a month for the apartment, originally. * * *

"Now then your question is, that I paid the $50 as a result of that lease?

"Q. Yes.

"A. That is right. * * *

"I wanted to see that he got $150 a month for the apartment. * * *

"Q. * * * Did you continue making $50 payments to Mr. Boyle, after you left the house, the apartment?

"A. No, sir."

Green was cross-examined at considerable length regarding his business dealings with Mr. Boyle and in particular regarding his cash payments of $50 a month to Boyle. He testified:

"The Court: Witness, you have testified that you paid him $50 a month as a part of the $150 per month rent on the apartment; you have testified to it two or three times, that you paid $100 from the office by check, and $50 to Mr. Boyle each month in cash?

"A. That is right, $100 by check that was done through the office, and I paid him $50 a month by cash.

"The Court: That was part of the rent?

"A. I figured it was part of the rent. * * *

"I did not want to break the law; I did pay him this $50 in cash. I paid him because I thought the apartment was still worth $150 a month. If this payment can be applied to something else, it is all right with me, either way. * * *

"The Court: You have repeatedly testified that it was your understanding that the $50 a month which you were paying in cash to Mr. Boyle was as rent?

"A. From my standpoint, correct.

"The Court: And at the time you paid these amounts of $50 in cash to Mr. Boyle,

did you consider yourself legally obligated to him for $1,250? * * *

"A. I cannot answer it 'Yes' or 'No'. * * *

"Q. Whether you were legally obligated or not, you did consider that you owed Mr. Boyle $1,250 on that note deal and the Berkey Company transaction?

"A. That is right."

Green testified in substance that in the winter of 1947, while in Florida, he had informed a friend, Mr. McKay, that he was paying Mr. Boyle more than the maximum ceiling rent on the apartment in question. He affirmed the testimony which he had given at the hearing on plaintiff's application for a preliminary injunction, to the effect that he considered the monthly payments of $50 to Mr. Boyle as rent. He also said that he discontinued the monthly payments to Mr. Boyle when he vacated the apartment.

Defendant Russell Boyle testified at length regarding his friendship and business dealings with tenant Green. He said in part:

"Q * * * Tell us * * * about the transaction in the winter of 1939 or early in 1940 with reference to the William A. Berkey Furniture Company. * * *

"A. * * * Then he (Green) asked if I would accept the $1,250 note, which I had given him, as part of the $2,500 payment, and $1,250 in cash. * * * At the time the note was outlawed; he could not have collected on it, but I accepted the note as part payment, because Mr. Green had been very fine about the note, he had never mentioned it, and never pressed it. * * * We tore the note up when he paid me the $1,250 cash. But I reminded him that I did not owe him the $1,250 when I gave him the note, and that at some future time I would expect that note to be taken into consideration on other deals which we might have, quite probably would have in the future, and he said 'That is right, we will straighten that up at some future time.' And so I accepted the note, got $1,250 cash, and went on with the deal. * * *

"After Mrs. Boyle received the notice from OPA, reducing the amount from $150

to $100 a month, Bert (Green) called me on the phone, and asked me to go to lunch with him. I went to lunch with him, and he said: 'Did Mrs. Boyle receive a notice from the OPA reducing the rent from $150 to $100 a month?' I said 'She did.' 'Well, we got the same notice,' and, he said, 'I am going to abide by OPA's ruling and pay $100 a month.' * * * I said: 'Sure you are going to abide by the OPA, I wouldn't want you to do it any other way.' And then I said: 'What about that $1,250 that you owe me, and have owed me for a long time? It seems to me that it is pretty near time we settled that obligation.' * * * Well, he got mad. * * *

"It was somewhere prior to Christmas of 1945.

"About a week later I imagine it was Mr. Green called me again and asked me to go to lunch with him. I accepted and we discussed the matter, where we left off and he said: 'You are absolutely right about it, Russ. I do owe you the money; I not only owe you $1,250 but I owe you many more things that I can never repay, and I am going to go ahead and pay you $150 every three months on that obligation of $1,250.' * * *

"He has not paid the entire $1,250 yet. * * *

"He has either paid $1,050 or $1,100. * * *

"It had no connection with the rent at all."

The above-quoted and other testimony discloses the following significant facts: (1) Tenant Green and defendant Russell Boyle had been close friends for many years; (2) prior to the order reducing the rent in December, 1945, tenant Green had paid Mrs. Boyle $150 a month by check; (3) after this reduction he paid Mrs. Boyle $100 a month by check and Mr. Boyle $50 a month in cash; (4) Green said that he and Boyle talked it over and agreed how the payments should be made; (5) Green testified he wanted to see that the Boyles got $150 a month for the apartment despite the order of the area rent office reducing the rent to $100 a month; (6) Green said he paid $100 to Mrs. Boyle by check and $50 to Mr. Boyle in cash because he felt that was a safe way to do it; (7) when Green vacated the apartment, he discontinued the monthly payments of $50 to Mr. Boyle; (8) the alleged indebtedness of $1,250, which Boyle claims tenant Green owed him, arose in connection with the promissory note which Boyle gave him in 1932, about 14 years prior to the rent matter here in question; (9) this promissory note was accepted back by Boyle in 1939 as a partial payment for his services in the furniture company stock transaction; (10) when Boyle accepted the return of his note in 1939, he destroyed it; (11) Green would not admit that he was legally indebted to Boyle in connection with the promissory-note transaction. It is particularly significant that Green began paying Boyle $50 a month in cash immediately after the apartment rent was reduced from $150 to $100 a month and that he discontinued these monthly payments when he vacated the apartment.

■ Tenants Green did not begin suit to recover the alleged rent overcharge for the apartment in question. The above-quoted provisions of the Emergency Price Control Act provide in effect that if the tenant fails to institute suit to recover a rent overcharge within 30 days from the date of the occurrence of the violation, the Administrator (now the Housing Expediter) may institute suit to recover the overcharge within one year from the date of the violation. The law is established that the court has authority to grant judgment for restitution of a rent overcharge to a tenant. See Porter, Price Administrator, v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332; Blood v. Fleming, 10 Cir., 161 F.2d 292; Creedon v. Randolph, 5 Cir., 165 F.2d 918.

In case a defendant fails to prove that his violation of a rent regulation or order was "neither willful nor the result of failure to take practicable precautions against the occurrence of the violation," the court under the penalty provisions of Section 205 (e) of the Act may grant judgment for the use and benefit of the United States for an amount not exceeding three times the amount of the overcharge during the one-year period preceding the beginning of suit. The present suit was begun on Octo-

ber 3, 1947, and during that part of the one-year period prior to June 30, 1947, when the Emergency Price Control Act of 1942, as amended, terminated, tenant Green had paid to Mr. Boyle in cash an aggregate amount of $400.

From careful examination of all evidence adduced, the court concludes that the cash payments of $50 a month were paid by tenant Green and received by defendant Russell Boyle as a "bonus, benefit, or gratuity, * * * in connection with the use or occupancy" of the apartment in question and constituted an evasion and violation of the rent-control law and regulations thereunder.

As hereinbefore noted, plaintiff dismissed the case against defendant Ann Boyle. Judgment will be entered in favor of plaintiff and against defendant Russell J. Boyle for restitution to the tenants, Adelbert G. Green and wife, of the sum of $1,050, and for single damages for the benefit of the United States of America in the amount of $400.